12-3720-cr
*United States v. DiCristina*

# UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term, 2012

(Argued: June 19, 2013 Decided: August 6, 2013)

Docket No. 12-3720

---

UNITED STATES OF AMERICA,

*Appellant*,
– v. –

LAWRENCE DICRISTINA,

*Defendant-Appellee*.

---

Before: STRAUB, HALL, AND CHIN, *Circuit Judges*.

---

Appeal from an order of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*), granting Defendant's motion to dismiss the second superseding indictment and vacating his conviction for operating and conspiring to operate an illegal poker business, in violation of 18 U.S.C. §§ 1955 and 371. We hold that the District Court erred in determining that Defendant's poker business did not fall within the ambit of the Illegal Gambling Business Act.

Accordingly, the order of the District Court is **REVERSED**.

---

MARISA M. SEIFAN, Assistant United States Attorney (David C. James, Nathan D. Reilly, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellant.*

CERTIFIED COPY ISSUED ON 08/06/2013

NEAL K. KATYAL (Christopher T. Handman, Dominic F. Perella, Elizabeth B. Prelogar, Hagan C. Scotten, *on the brief*), Hogan Lovells US LLP, Washington, DC, *for Defendant-Appellee*.

Patrick W. Fleming, Portsmouth, NH, *for amici curiae Amateur Poker Players in support of Defendant-Appellee.*

Paul D. Clement (D. Zachary Hudson, *on the brief*), Bancroft PLLC, Washington, DC, *for amicus curiae Robert C. Hannum, in support of Defendant-Appellee.*

Anand S. Raman (Michael A. McIntosh, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, *for amicus curiae James McManus in support of Defendant-Appellee.*

Thomas C. Goldstein (Tejinder Singh, *on the brief*), Goldstein & Russell, P.C., Washington, DC, *for amicus curiae The Poker Players Alliance in support of Defendant-Appellee.*

Miguel A. Estrada (Jonathan C. Bond, *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, DC, *for amici curiae Former United States Attorneys Roscoe C. Howard, Jr. and Robert J. Cleary in support of Defendant-Appellee.*

Erik S. Jaffe, Washington, DC, *for amici curiae Joe Edley, Jesse Day, and Martin Fleisher in support of Defendant-Appellee.*

Kenneth L. Adams (Christopher T. Leonardo, *on the brief*), Adams Holcomb LLP, Washington, DC, *for amici curiae Michael Sexton, Gregory Raymer, Jonathan Little, and Vanessa Selbst in support of Defendant-Appellee.*

Lisa S. Blatt (Matthew C. Phillips, R. Stanton Jones, *on the brief*), Arnold & Porter LLP, Washington, DC, *for amicus curiae Chamath Palihapitiya in support of Defendant-Appellee.*

STRAUB, *Circuit Judge*:

The United States appeals from an August 21, 2012 order of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) entering a post-verdict judgment of acquittal in favor of Defendant-Appellee Lawrence DiCristina, setting aside the guilty verdict on one count of violating the Illegal Gambling Business Act (the "IGBA"), 18 U.S.C. § 1955, and one count of conspiring to do so under 18 U.S.C. § 371. The District Court ruled that DiCristina's conviction must be set aside because "Texas Hold'em" poker was not covered by the IGBA. *United States v. DiCristina*, 886 F. Supp. 2d 164 (E.D.N.Y. 2012). Because we find that the plain language of the IGBA covers DiCristina's poker business, we **REVERSE** the judgment of acquittal and **REMAND** to the District Court with instructions to reinstate the jury verdict, enter a judgment of conviction on both counts, and proceed with sentencing DiCristina.

## BACKGROUND

The basic facts of this case are not in dispute: between December 2010 and May 2011, DiCristina, along with his co-defendant Stefano Lombardo and others, operated a poker club in the back room of a warehouse in Staten Island, New York, out of which he conducted a legitimate business selling electric bicycles. *DiCristina*, 886 F. Supp. 2d at 198. The poker games,[1] which were generally held twice a week, were advertised by word of mouth and text

[1] The District Court limited its analysis to Texas Hold'em, which is the variant of poker at issue here. *See DiCristina*, 886 F. Supp. 2d at 168. However, we use the term "poker" in this opinion generally to refer to any kind of poker that would be considered gambling under New York State law. For purposes of this opinion, we see no reason to distinguish Texas Hold'em from other

message. *Id.* "The club contained two tables at which No Limit Texas Hold'em was played." *Id.* The dealers collected a five percent "rake" for the house from each pot, twenty-five percent of which they kept as payment. *Id.* "The remaining funds from the rake were used for expenses relating to the operation of the business and for profits." *Id.* Other than the operation of these poker games, no unlawful conduct by DiCristina is alleged. *Id.* DiCristina and Lombardo pleaded guilty on December 12, 2011. On May 1, 2012, DiCristina was permitted to withdraw his guilty plea, and the matter was set for trial.

On June 29, 2012, DiCristina moved to dismiss the second superseding indictment on the basis that poker is not house-banked[2] or predominated by chance, and thus is not encompassed in the IGBA's enumerated list of illegal types of "gambling." The District Court heard testimony by DiCristina's expert, Dr. Randall Heeb, as to why skill predominates over chance in poker, *DiCristina*, 886 F. Supp. 2d at 173-85, but reserved decision on the motion to dismiss, and the parties went forward with trial. *Id.* at 168. Over DiCristina's objection, the District Court ruled that the question of whether poker fell within the IGBA was a question of law to be decided by the court, excluded Dr. Heeb's testimony as irrelevant, *id.* at 171, and instructed the jury that gambling under the IGBA "includes playing poker for money." [GA205]

---

variations of poker. *See generally* Br. for Amicus Curiae Amateur Poker Players (explaining rules and features common to all poker games as well as rules of Texas Hold 'em); s*ee also* Br. for Amici Curiae Michael Sexton, Gregory Raymer, Jonathan Little and Vanessa Selbst, Appendix A (explanation of Texas Hold'em).

[2] According to the Poker Players' Alliance *amicus brief*, a house-banked game is one "in which the house competes directly against its customers." (Br. for Amicus Poker Players' Alliance at 23). House-banked games "include blackjack, craps, roulette, bacarrat, punto banco (minibaccarat), and the big wheel," as well as "Las Vegas sports betting." *Id.*

The jury found DiCristina guilty on both counts charged in the second superseding indictment. DiCristina then renewed his motion to dismiss in the form of a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29. He argued that (1) in order for conduct to come under the purview of the IGBA, it must be sufficiently similar to the nine games enumerated in § 1955(b)(2); and (2) poker did not fall within the statutory definition of an illegal gambling business because it was neither house-banked nor predominated by chance. *DiCristina*, 886 F. Supp. 2d at 169. The Government argued that subsection (b)(2) did not, by its plain language, restrict the games that constitute unlawful gambling under the IGBA and therefore it was sufficient for purposes of the statute that a gambling activity was illegal under state law, as poker was under New York law in this instance. *Id.* After considering additional briefing and expert testimony from both sides, the District Court dismissed the second superseding indictment and entered a judgment of acquittal.

The District Court determined that both the Government and DiCristina presented plausible readings of the statute, and that the legislative history was not decisive as to whether Congress meant to include poker within the IGBA. Reasoning that the IGBA did not "provide explicit criteria" for defining gambling, and that there were "ambiguities in the federal definition of gambling," the District Court found that the "governing criteria must be derived by determining what common characteristics unif[y] the games listed in § 1955[(b)(2)] into a cohesive group. " *Id.* at 226. The District Court found that "dictionary, common law, and other federal definitions of gambling argue in favor of a definition limited to games of chance." *Id.* at 230. It then determined that poker did not constitute "gambling" under the IGBA because poker is predominated by skill rather than chance. *Id.* at 234. This timely appeal followed.

## DISCUSSION

## I. Applicable Law

We review a district court's legal conclusions, including those interpreting the meaning of a statute, *de novo*. *United States v. Stewart*, 590 F.3d 93, 109 (2d Cir. 2009); *United States v. Koh*, 199 F.3d 632, 636 (2d Cir. 1999).

When interpreting a statute, we "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (interpreting 18 U.S.C. § 3292) (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)) (internal quotation marks omitted). "Where the statute's language is 'plain, the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Statutory enactments should, moreover, be read so as "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)) (internal quotation marks omitted); *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting "the settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"); *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994) ("[C]ourts will avoid statutory interpretations that render provisions superfluous."). And "[t]he 'whole act' rule of statutory construction exhorts us to read a section of a statute not 'in isolation from the context of the

whole Act' but to 'look to the provisions of the whole law, and to its object and policy.'" *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962)).

In the event that the text of a statute is not clear, a court interpreting the statute may consult the legislative history to discern "the legislative purpose as revealed by the history of the statute." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 627 (1993); s*ee also United States v. Gayle*, 342 F.3d 89, 93-94 (2d Cir. 2003) (looking to legislative history where text of statute was ambiguous as to what constitutes a predicate offense under 18 U.S.C. § 922(g)(1)). "Our obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result." *Johnson v. United States*, 529 U.S. 694, 710 n.10 (2000). Where Congress provides no definition for a term in a statute, we "consider the ordinary, common-sense meaning of the words." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000).

Finally, we have recognized that "[t]he rule of lenity provides that ambiguities concerning legislative intent in criminal statutes should be resolved in favor of the accused." *United States v. Figueroa*, 165 F.3d 111, 119 (2d Cir. 1998). The rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997). However, "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 130 S. Ct. 2499, 2508-09 (2010) (internal citations and

quotation marks omitted); s*ee also Bifulco v. United States*, 447 U.S. 381, 387 (1980) ("[T]he touchstone of the rule of lenity is statutory ambiguity." (internal quotation marks omitted)).

## II. Text of the Statute

### A. Statutory Scheme

The IGBA provides in relevant part:

**Prohibition of illegal gambling businesses**

> (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an *illegal gambling business* shall be fined under this title or imprisoned not more than five years, or both.
> (b) As used in this section –
> (1) "illegal gambling business" means a gambling business which—
> (i) is a violation of the law of a State or political subdivision in which it is conducted;
> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
> (2) "gambling" *includes but is not limited to* pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy[3], bolita[4] or numbers games, or selling chances therein.
> (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

18 U.S.C. § 1955 (emphasis added).

---

[3] Policy is defined as "a daily lottery in which participants bet that certain numbers will be drawn from a lottery wheel." *Webster's Third New International Dictionary* 1754 (1993).

[4] Bolita is Spanish for "little ball." It is defined as: "1. A game of chance having the character of a lottery in which a bag of small numbered balls is tossed about until only one remains or until one is grasped at random, the ball so selected being considered as bearing the winning number. 2. A numbers game in which one attempts to guess a variously determined 2-digit number." *Webster's Third New International Dictionary* 248 (1993).

Subsection (e) of the IGBA excludes from the statute's scope "any bingo game, lottery, *or similar game of chance* conducted by" a tax-exempt organization. *Id.* § 1955(e) (emphasis added).

Pursuant to § 1955(b)(1)(i), we look to state law definitions of gambling. New York law provides that:

> A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

N.Y. Penal Law § 225.00(2).

A "contest of chance" is in turn defined under New York law as "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." *Id.* § 225.00(1). The parties do not dispute that poker constitutes gambling under New York State law. *See DiCristina*, 886 F. Supp. 2d at 168-69 (noting that DiCristina had waived the argument that poker was not gambling under New York law and explaining that it has no merit).[5]

[5] As the District Court explained, New York State courts have long held that poker contains a "sufficient element of chance to constitute gambling under that state's laws." *DiCristina*, 886 F. Supp. 2d at 169 (citing *Dalton v. Pataki*, 780 N.Y.S.2d 47, 64 n.5 (3d Dep't 2004) (noting that "the term 'game of chance' or 'contest of chance' . . . has been interpreted to include such games as 'stud' poker" (internal citations omitted)); *People v. Turner*, 629 N.Y.S.2d 661, 662 (N.Y. Crim. Ct. 1995) ("Games of chance range from those that require no skill, such as a lottery , to those such as poker or blackjack which require considerable skill in calculating the probability of drawing particular cards. Nonetheless, the latter are as much games of chance as the former, since the outcome depends to a material degree upon the random distribution of cards. The skill of the player may increase the odds in the player's favor, but cannot determine the outcome regardless of the degree of skill employed.") (internal citations omitted); *People v. Dubinsky*, 31 N.Y.S. 2d 234, 237 (Bronx Cnty. Ct. Spec. Sess. 1941) ("There is no doubt that playing 'stud' poker for money" is a game of chance and "constitutes gambling.")).

The Supreme Court has observed that the IGBA "declar[es] that certain gambling activities violate federal as well as state law," thereby "giv[ing] the Federal Government a new substantive weapon" with which to "strike at organized crime's principal source of revenue: illegal gambling." *Iannelli v. United States*, 420 U.S. 770, 788 (1975). In *Sanabria v. United States*, 437 U.S. 54 (1978), the Court noted that:

> Congress did not assimilate state gambling laws *per se* into the federal penal code, nor did it define discrete acts of gambling as independent federal offenses. The Government need not prove that the defendant himself performed any act of gambling prohibited by state law. It is participation in the gambling business that is a federal offense, and it is only the gambling business that must violate state law.

*Id.* at 70 (internal citations and footnotes omitted).

### B. Requirements of the IGBA

The plain language of § 1955 clearly outlines the activity that it proscribes. It criminalizes the act of running a gambling business that (1) operates in violation of the law of the state in which the business is conducted; (2) is conducted by five people or more; and (3) is *either* in operation for more than thirty days *or* earns more than $2,000 in one day. *See* 18 U.S.C. § 1955(b)(1). The inclusion of elements (2) and (3) demonstrates that the focus of the statute's criminal proscription is not on what game is being played, but on the size of the business and the revenue derived by those who are running it. *See Sanabria*, 437 U.S. at 70 ("It is participation in the *gambling business* that is a federal offense") (emphasis added). As the District Court noted, "most 'kitchen table' poker games would not satisfy either or both of these requirements." *DiCristina*, 886 F. Supp. 2d at 201. DiCristina's poker business, it is undisputed, satisfied both.

DiCristina contends that the IGBA does not apply to a poker business, however, because poker does not fit within the "definition of gambling" set forth in subsection (b)(2).[6] *See* Appellee's Br. at 12-17. But unlike subsection (b)(1), which defines "illegal gambling business," or subsection (b)(3), which defines the term "State," subsection (b)(2) is tellingly not prefaced by the verb "means." *See Groman v. Comm'r of Internal Revenue*, 302 U.S. 82, 86 (1937) ("[W]hen an exclusive definition is intended the word 'means' is employed . . . ."). Had Congress intended to create a definition of "gambling" unique to the IGBA, or to confine the reach of the IGBA to businesses involving certain types of gambling, it could have inserted such language.[7] Instead, subsection (b)(2) states that "gambling includes *but is not limited to*" the nine activities listed. 18 U.S.C. § 1955(b)(2) (emphasis added). It does not include the words "games similar to" or any other such language limiting subsection (b)(2) to include only games

[6] We note that DiCristina's argument improperly conflates the important distinction between gambling, which is not prohibited by the IGBA, and operating a gambling business, which is prohibited by the IGBA.

[7] The language of subsection (b)(2) is particularly significant when compared to the earlier version of the IGBA which was not adopted. That version read: "[T]he term 'illegal gambling business' *means* betting, lottery, or numbers activity which (1) is a violation of the law of a State or political subdivision thereof; (2) involves five or more persons who operate, work in, participate in, or derive revenue from said betting, lottery, or numbers activity; and (3) has been or remains in operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." *See* Illegal Gambling Business Control Act of 1969, S.2022, 91st Cong., 1st Sess. § 201 (April 29, 1969) (emphasis added). Such a statute would be limited to certain types of gambling. However, Congress opted to simply define "illegal gambling business" to mean a business that violates state law, plus the other two elements (five or more persons, and either operation for more than thirty days or gross revenue of $2,000 or more in a single day), and to eliminate the narrow definition of gambling (*i.e.*, applies only to betting, lottery, or numbers activity).

analogous to those enumerated.[8] Rather, the phrase "includes but is not limited to" signals a non-exhaustive list of examples of gambling activities.[9]

DiCristina contends that reading the statute in this way renders subsection (b)(2) purposeless. *See* Appellee's Br. at 24-29. We disagree. Subsection (b)(2) lists acts of running a gambling business – "poolselling," "bookmaking," "maintaining" gambling devices, and "conducting" games – rather than the games themselves. 18 U.S.C. § 1955(b)(2). It thus serves as an illustration of what may constitute running a gambling operation. As the District Court

[8] The statutory canon of *ejusdem generis* has no place here because the plain meaning of the statute is apparent. *See United States v. Turkette*, 452 U.S. 576, 581 (1981) (*ejusdem generis* is "an aid to statutory construction problems suggesting that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated"). As the District Court acknowledged, "[t]he rule of *ejusdem generis* . . . comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute." *DiCristina*, 886 F. Supp. 2d at 226 (citing *Turkette*, 452 U.S. at 581). "[C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation" which do not come into play if the language of the statute is plain. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

Moreover, because we find that subsection (b)(2) is not definitional, we do not need to decide whether poker – or any other type of gambling – is sufficiently like the enumerated games to fall within the IGBA. Rather, the gambling activity must only be prohibited by state law and meet the additional criteria set forth in the IGBA.

[9] We do not suggest that a statute can never define a term using the verb "includes" or the phrase "includes but is not limited to." Rather, we hold only that § 1955(b)(2) does not define the term "gambling" in light of the specific language of that subsection and the context in which it appears.

DiCristina contended for the first time at oral argument that we are constrained by the Government's "concession" that subsection (b)(2) contains a definition of the word "gambling." The Government has not conceded this point, *see* Appellant's Br. at 13 ("the IGBA does not contain a definition of 'gambling'"), *id.* at 16 (arguing that subsection (b)(2) does not define gambling for purposes of the IGBA), but, even if it had, we are obligated to determine the meaning of the statute as it was written by Congress, not as argued by the Government in this case.

recognized, this reading of subsection (b)(2) supports the notion that Congress was "concerned with illustrating types of gambling businesses . . . rather than on creating a limiting definition of gambling under federal law." *DiCristina*, 886 F. Supp. 2d at 222.

DiCristina also argues that § 1955(e) "confirms that the unifying characteristic of the prohibited games is that each is a game of chance," Appellee's Br. at 17, because the games that are included by the language of subsection (b)(2) must be the same as those games that are excluded by subsection (e). Subsection (e), it is undisputed, creates an exemption for the activities of charities. It does not make any reference to subsection (b)(2), and does not state that it modifies or applies to that subsection in any way. Had Congress intended to limit the reach of the IGBA to businesses operating games of chance, it could have done so by inserting that language in subsection (b)(2). The District Court's decision to limit the IGBA to games of chance was based on its finding that the statute was ambiguous as to what gambling activities it covered. *See DiCristina*, 886 F. Supp. 2d at 230. Because we find no such ambiguity, we decline to limit the statute's reach beyond its plain terms.

Thus, the question of whether skill or chance predominates in poker is inapposite to this appeal.[10] The language of the statute is clear that it contains only three requirements, all set forth in subsection (b)(1), and all of which were met in this case.

Our precedent is consistent with this holding. In *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), we ruled of § 1955:

[10] We note that the District Court's analysis, which turned on the question of whether skill predominates in a particular game, would, as the District Court acknowledged, "require 'an ad hoc analysis of how similar or dissimilar the game was to those listed in IGBA's list of examples,' creating an 'extraordinarily complex and unpredictable approach to the statute.'" *DiCristina*, 886 F. Supp. 2d at 224.

> This statute provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an *illegal gambling business* shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1955(a). An "illegal gambling business," in turn, is defined as one "which (i) is a violation of the law of a State . . . in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." 18 U.S.C. § 1955(b)(1).

*Id.* at 340 (emphasis in original).

In *Gotti*, defendant Bondi was convicted of two counts of violating the IGBA– one for running a bookmaking business, and one for maintaining an electronic machine poker game called Joker-Poker. He challenged his conviction of the latter count on the grounds that Joker-Poker machines were not "illegal gambling devices" under New York State law because the games played thereon were "games of skill rather than contests of chance." *Id.* at 342. We rejected this argument, finding that under New York law a "contest of chance" encompasses games in which the skill of the contestants may play a role, so long as the outcome depends in a material degree on chance. *Id.*

While the parties in *Gotti* did not raise the argument now made by DiCristina, we specifically ruled in that case that an "illegal gambling business" is "defined as one which" met the three elements articulated in subsection (b)(1). *Id.* at 340.[11] DiCristina now asks us to find

[11] The Ninth Circuit has also ruled that in order to prove an "illegal gambling business" in violation of 18 U.S.C. § 1955, only three elements must be established: (1) violation of the law of a state in which the illegal gambling business is conducted; (2) the involvement of five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (3) substantially continuous operation for a period in excess of thirty days or gross revenue of $2,000 in any single day. *See, e.g.*, *United States v. Sacco*, 491 F.2d 995, 998 (9th Cir. 1974) (en banc) (noting the three elements enumerated in § 1955(b)(1)(i)-(iii) must be established to constitute an offense under the IGBA); s*ee also United States v. Real Prop., Titled*

that the statute requires the Government to prove that the alleged business activity meets a fourth element – the "definition of gambling" in subsection (b)(2).

As the District Court acknowledged, the only Circuit court to have directly addressed this issue is the Third Circuit in *United States v. Atiyeh*, 402 F.3d 354 (3d Cir. 2005). In *Atiyeh*, the Third Circuit rejected the argument DiCristina now advances, stating:

> [Defendant] argues that the conduct for which he was convicted, becoming a custodian of funds that were wagered or to be wagered, does not come within the limited definition of what constitutes "gambling" under 18 U.S.C. § 1955(b)(2). This argument is flawed. The relevant definition for our purposes is that of an "illegal gambling business," provided for in 18 U.S.C. § 1955(b)(1), not the definition of "gambling" provided for in § 1955(b)(2). The jury found that [defendant] violated [a Pennsylvania statute], and therefore operated an "illegal gambling business" as defined by 18 U.S.C. § 1955(b)(1). We have held that the mere custodianship of gambling-related funds is sufficient to constitute a violation of 18 U.S.C. § 1955, because such custodianship is considered to be "gambling" under state law even though it may not appear to fit within "gambling" as defined in § 1955(b)(2).

402 F.3d at 372 (footnote omitted). Thus, the Third Circuit has arrived at an understanding of the IGBA similar to the one we reach today.

Indeed, federal courts have repeatedly applied the IGBA to businesses operating games – including poker – that are not enumerated therein, without reading the statute to contain a definition in subsection (b)(2). *See United States v. Useni*, 516 F.3d 634, 656-57 (7th Cir. 2008) (applying IGBA to bingo hall); *Gotti*, 459 F.3d at 341 (same as to business operating video game

---

*in the Names of Godfrey Soon Bong Kang & Darrell Lee*, 120 F.3d 947, 949 (9th Cir. 1997) (government had probable cause to require the forfeiture of assets where it had demonstrated the three elements listed in § 1955(b)(1)(i)-(iii), and the business consisted of cockfighting, dice, and cards); *United States v. E.C. Invs., Inc.*, 77 F.3d 327, 329 (9th Cir. 1996) (in prosecution regarding slot machines, noting that "Section 1955 prohibits the operation or ownership of 'an illegal gambling business,' which the section defines as 'a violation of the law of a State or political subdivision in which it is conducted'"). Although it has never directly addressed the issue, the Ninth Circuit does not treat subsection (b)(2) as definitional.

Joker Poker); *United States v. Pack*, 16 F.3d 1222, at *2-3 (6th Cir. Jan. 25, 1994) (unpublished opinion) (same as to multi-faceted gambling business that included poker); *United States v. Trupiano*, 11 F.3d 769, 771-72 (8th Cir. 1993) (same as to gin rummy business); *United States v. Rieger*, 942 F.2d 230, 233 (3d Cir. 1991) (same as to poker business); *United States v. Zannino*, 895 F.2d 1, 4-5 (1st Cir. 1990) (same); *United States v. Angiulo*, 897 F.2d 1169, 1200-01 (1st Cir. 1990) (same); *United States v. Reitano*, 862 F.2d 982, 984 (2d Cir. 1988) (same as to blackjack business); *United States v. Shursen*, 649 F.2d 1250, 1257 (8th Cir. 1981) (same); *United States v. Dadanian*, 818 F.2d 1443, 1447-49 (9th Cir. 1987) (same as to poker club), *rev'd on reh'g on other grounds*, 856 F.2d 1391 (1989); *United States v. Tarter*, 522 F.2d 520, 524, 527 (6th Cir. 1975) (rejecting argument that IGBA did not cover defendant's small scale back-room poker business, which consisted of "seven card stud with a fifty cent opener and a two to four dollar limit on raises"); *United States v. Dey*, No. 07-cr-725, 2009 WL 1730956, at *1 (E.D.N.Y. June 18, 2009) (poker business); *United States v. Hsieh*, Cr. No. 11-00081, 2013 WL 1499520, at *4-6, *7 (D. Guam Apr. 12, 2013) (same).

In sum, courts have overwhelmingly read the IGBA to have only three elements: (1) the gambling business violates the law of the state in which the business is conducted; (2) the business involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (3) the business has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. *See, e.g.*, *United States v. Truesdale*, 152 F.3d 443, 446 (5th Cir. 1998) ("Under section 1955, an illegal gambling business is defined as a gambling business that: (1) violates state or local law, (2) involves 5 or more people, and (3) is in continuous operation for more than 30 days or has

gross revenue of $2,000 in any single day."); *United States v. Cyprian*, 23 F.3d 1189, 1199 n.14 (7th Cir. 1994) (same); *United States v. Sacco*, 491 F.2d 995, 998 (9th Cir. 1974) (en banc) (same). We agree, and today hold that an "illegal gambling business" is one which meets the three elements articulated in subsection (b)(1).

## III. Legislative History

Based on the clear text of the IGBA, we could conclude without an examination of Congress's intention in drafting it. Indeed, we look to the legislative history of a statute only where the text itself is not "absolutely clear." *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000); *accord Mary Jo C.*, 707 F.3d at 171 ("[H]aving found the relevant provisions of the statute unambiguous, we do not have warrant to [consult the legislative history of the statute]."). We agree with the District Court that there appears to be "something for everybody" in the legislative history, *DiCristina*, 886 F. Supp. 2d at 223, and we review it here briefly only to demonstrate that Congress's unmistakable purpose in enacting the IGBA bolsters our reading of the statute's clear and unambiguous text.

The legislative history is remarkably clear that the passage of this statute was driven by the desire to crack down on organized crime. As the District Court noted, "[t]he debates focused not on prohibiting particular kinds of gambling, but on targeting particular kinds of criminals – i.e., reaching 'those who are engaged in an illicit gambling business of major proportions.'" *DiCristina*, 886 F. Supp. 2d at 204 (quoting S. Rep. No. 91-617, at 73 (1969); H.R. Rep. No. 91-

1549, at 53 (1970)).[12] The aim of 18 U.S.C. § 1955 was "to give the Federal Government a new substantive weapon, a weapon which will strike at organized crime's principal source of revenue: illegal gambling." S. Rep. No. 91–617, at 71; *see also* Senate Judiciary Hr'gs at 449 (Message from the President of the United States Relative to the Fight Against Organized Crime) ("The purpose of this legislation is to bring under federal jurisdiction all large-scale illegal gambling operations which involve or affect interstate commerce."). Thus, the IGBA was driven by concerns about the revenue generated by large scale gambling business rather than the games that were played. *See, e.g.*, S. Rep. No. 91–617, at 71; Senate Judiciary Hr'gs at 158 (statement of Sen. Tydings) ("The greatest single source of revenue for organized crime is its gambling activities, which net an estimated seven (7) to fifty (50) billion dollars a year . . . .").

There was some discussion during the legislative debates of which games organized crime was using toward this end. Various legislators noted the fact that organized crime was involved in "lotteries, dice games, and illegal casinos" in addition to "horse racing and sporting events." 116 Cong. Rec. 590 (Jan. 21, 1970) (statement of Sen. McClellan). "Mafia-run numbers rackets," *DiCristina*, 886 F. Supp. 2d at 208, were discussed, as was bookmaking, which many were concerned allowed national crime syndicates to finance their activities, *see id.* at 208-09 (legislative history reflects concern about money made in bookmaking). As the District Court acknowledged, there is nothing in the legislative history suggesting that whether a game was predominated by chance was relevant to whether a business operating that game

[12] The District Court has a "comprehensive collection" of the relevant history on file. *DiCristina*, 886 F. Supp. 2d at 210 (citing Dkt. No. 106). Because the parties do not dispute the District Court's able survey of the legislative history and did not submit a version of the legislative history to this Court, we use the citations provided by the District Court.

constituted an illegal gambling business under the IGBA. *See DiCristina*, 886 F. Supp. 2d at 206.

Although poker was not discussed at length, the dialogue about poker that did occur suggests Congress anticipated that poker would be included within the reach of the IGBA as it was ultimately enacted.

> Mr. MIKVA: I would like to yield further but I have more examples of overreach that would even curl the hair of the gentleman from Virginia.
>
> I do not know how many of my colleagues engage in a friendly game of poker now and then, but under th[e IGBA's] definition [of gambling] if five or more of them engage in such a game of poker and it lasts past midnight—you do have that safeguard – thus continuing for a period of 2 days, then you have been running an organized gambling business and you can get 20 years, and the Federal Government can grab the pot besides [. . . .]
>
> We have a whole series of new crimes involving gambling and some of them, as I indicated, include even the poker game that goes beyond midnight. Under the bill, it can be an organized gambling game and one can get up to 20 years for having participated in that poker game.

116 Cong. Rec. 35204-05 (Oct. 6, 1970).

The concern that the IGBA would criminalize non-commercial private poker games was assuaged by comments mentioning the requirements currently set forth under § 1955(b)(1), and not by comments indicating that poker is a game of skill.

> Mr. POFF: I suggest that the gentleman is in error when he poses his hypothetical statement. I direct his attention to page 11, line 15 and 16 of the bill. There you will find that illegal gambling means a business and has been and remains in substantially continuous operation for a period in excess of 30 days or has a gross revenue in excess of $2,000 in any single day. The poker game which the gentleman has described does not meet that criterion.
>
> Mr. MIKVA: But that is not true because later on there is a presumption that it is an illegal gambling business. That language appears on page 114 and is as follows:

> If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for 2 or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.
>
> Mr. POFF: If they are in the gambling business.
>
> Mr. MIKVA: I suppose it depends on whether you are gambling for profit or pleasure, but I happen to know a lot of people who do enjoy the profit as well as the pleasure, and I would hate to rely on the "nondefinition" of business to protect somebody from a zealous U.S. attorney.

*Id.* at 35205.

Thus, to the extent that poker was discussed, there was some acknowledgment that some businesses operating poker games would fall within the IGBA, but that the other requirements of the statute would exclude the typical friendly game of poker from the statute's reach.

**IV. Rule of Lenity**

DiCristina argues that the rule of lenity requires us to construe any ambiguity in the IGBA in his favor. *See* Appellee's Br. at 49. "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." *Barber*, 130 S. Ct. at 2508 (internal quotation marks omitted); *see also United States v. Venturella*, 391 F.3d 120, 133 (2d Cir. 2004) (noting that this Court applies the rule of lenity as a "last resort"). A statute is not "'ambiguous' for purposes of lenity merely because it [i]s *possible* to articulate a construction more narrow than that urged by the Government." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (emphasis in original). Here,

as discussed, the plain language of § 1955 unambiguously indicates that DiCristina's poker business constituted an "illegal gambling business" in violation of the statute. Thus, there is no need to turn to a rule of construction to further divine the meaning of the statute, and the rule of lenity does not apply.

**V. Statutory Construction is a Question of Law**

Lastly, DiCristina argues that his acquittal nonetheless must stand because the District Court improperly refused to submit to the jury the question of whether poker constitutes gambling for purposes of the IGBA. *See* Appellee's Br. at 52. This argument is without merit.

While a defendant has the right to have a jury decide whether the prosecution has proved the elements of the charged crime, *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995), the district judge must resolve questions of law, *id.* at 513. DiCristina argues that whether poker constitutes gambling under the IGBA is a mixed question of fact and law. *See id.* at 512 (recognizing that mixed questions of law and fact have typically been resolved by juries.). As is clear from our above discussion, whether poker constitutes gambling under the IGBA is purely a question of statutory interpretation, and therefore raises only a question of law. *See Dunlop Tire & Rubber Corp. v. Interstate Commerce Comm'n*, 724 F.2d 349, 350 (2d Cir. 1983) (per curiam) (indicating statutory interpretation presents a question of law).

The cases upon which DiCristina relies are not to the contrary. In *United States v. Banki*, 685 F.3d 99 (2d Cir. 2011), we found error in a jury instruction that a "hawala" – an intermediary for distributing funds – was a "money transmitting business" within the meaning of 18 U.S.C. § 1960. *Id.* at 114. However, in that case, the parties agreed that "transferring funds

through a hawala qualifies as 'money transmitting' under § 1960." *Id.* at 113. Because the court had instructed the jury that a hawala was "an unlicensed value transfer *system*, through which money was sent to Iran," we held that the jury instruction had improperly "relieved the government of its burden of proving [the defendant's] knowledge that money was moving to Iran extended beyond [a single transaction]." *Id.* at 114 (emphasis in original). We did not hold that the jury should have decided whether a hawala was a money transmitting business within the meaning of the statute. *Banki* therefore does not help DiCristina, who argues that the jury should have decided whether or not poker was gambling, not that the District Court prevented the jury from deciding a crucial element of the charged offense (*e.g.*, whether he was intentionally running a No Limit Texas Hold'em game).

DiCristina's citation to *Ling Nan Zheng v. Liberty Apparel Co.*, 617 F.3d 182 (2d Cir. 2010), is similarly unavailing. In that case we affirmed the district court's decision to allow the jury to determine whether the defendant was the plaintiff's "joint employer" within the meaning of the Fair Labor Standards Act. *Id.* at 186. We held that the determination was a mixed question of law and fact properly given to the jury. *Id.* at 185-86. Unlike the element at issue in *Liberty Apparel*, whether poker constitutes gambling for purposes of the IGBA is a pure question of statutory interpretation and thus a question of law, which does not depend on the particular facts of any one case.[13]

[13] Because we find DiCristina's argument on this second point to be without merit, we do not address the Government's contention that it is unreviewable on appeal. *See* Appellant's Reply Br. at 30-33. As the District Court noted in its conclusion, a reversal of its decision and reinstatement of the jury verdict does not violate DiCristina's double jeopardy rights. *DiCristina*, 886 F. Supp. 2d at 235.

## CONCLUSION

Because we find that the plain language of the IGBA includes DiCristina's poker business, we **REVERSE** the judgment of acquittal and **REMAND** to the District Court to reinstate the jury verdict, enter a judgment of conviction on both counts, and proceed with sentencing DiCristina.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit